DeCARLO, Judge.
On July 18, 1977, the grand jury of Barbour County indicted Floyd Byrd, charging:
“. . . Floyd Byrd, whose name is to the Grand Jury otherwise unknown, did assault with a deadly weapon William Petty, a peace officer of this State, while the said officer was engaged in the active discharge of his duty or duties, by shooting at him with a gun or pistol, . . .”
After a jury trial on August 10, 1977, Byrd was found guilty and sentenced to five years. Notice of appeal was given, and, on motion by retained counsel, bail was fixed and the execution of sentence was suspended.
The facts presented by the State in support of the indictment were, that on May 2, 1977, Officer William Petty, Jr., of the Clayton Police Department, was on routine patrol in a police car, and in uniform. He had stopped at a dry cleaners and, while talking to the proprietor, received a call over the car radio from Terry Gilmore. Petty was told to go to the Westville Courts housing project and pick up R. V. Jones for a bail bondsman in Eufaula.
Petty explained that he could not pick Jones up without a warrant. He was then instructed to call the bondsman. Petty returned to police headquarters, called the bondsman, and explained to him that he could not pick Jones up without a warrant, but would go to the project and ask Jones to call the bondsman.
It was approximately 9:30 P.M., when he arrived at the housing project. After delivering the message, he was driving on a street in the project, and noticed Floyd Byrd’s car was parked improperly on the street. The officer got out of his car, asked Byrd to park his car properly, then returned to his own car. After parking his car, Byrd walked over to the patrol car and stuck his hand inside. According to Petty, Byrd said: “Nigger, somebody is going to blow you up.” Petty responded: “Well, Floyd, I hope you be the lucky one.” Byrd shook his finger at the officer and Petty and reached to get his night stick from the floorboard. Petty struck the appellant on the hand. The officer then got out of his car and the two “kept swapping words.” The appellant then ran his hand in his pocket and pulled out a knife. Petty said to the appellant: “Floyd, put your knife back up before you make me do something I’ll be sorry about.”
The officer said they were both standing at the rear of the ear when the appellant said: “Don’t nobody like you, you aint nothing but a white man’s pimp.” The officer replied: “Well, Floyd, you break the law and that is it, white or black.” Petty recalled that it was about then that Charles Hall started walking down the sidewalk toward them, and he (Petty) unsnapped his holster, cocked his gun, and dropped it down beside his leg. As Petty continued to watch Charles. Hall, a third man at the scene caught the appellant by the arm and said: “Come on Byrd. Every dog got his day. I don’t like him anyway either.” *117 Thompson, Hall and the appellant then left the scene.
Petty returned to his car and as he was driving through the project, about fifteen or twenty miles per hour, he heard a shot hit the passenger side of the car and shatter the glass. Petty said he grabbed his shotgun, got out and went to the rear of the patrol car, and fired. He testified that he returned fire in the direction from where the shot was fired, explaining that he saw a silhouette in a window of a man wearing a hat. Further, he said he recognized the hat because: “I had not too long ago talked to the man who had it on.”
During cross-examination, Petty said that at the time of his encounter with Byrd Martha Ann Eutsey was standing near a parked car, but after he drove off and returned to where the shooting occurred she was not there.
Petty also said that he had not had any prior difficulty with the appellant and that they had “gotten” along fine.
Two witnesses testified that they had heard the discussion between the police officer and the appellant. Both testified that Byrd had threatened to kill the officer.
Martha Ann Eutsey testified that she had heard the argument while standing near the police car. She said she overheard Byrd say to the officer: “I have been wanting your ass for a long time. You shot my dog.” According to Eutsey, Jeff Thompson, at that time, said something to the appellant and Officer Petty then drove off.
She stated that she then saw the appellant get out of a car with a “long gun” and walk to a nearby house.
Eutsey testified that she then went to a neighbor’s house and, after discussing the incident with some people she knew there, she left and went to her house. According to Eutsey, as she approached the house, she heard a “big boom” and then heard the sound of glass falling. She stated that she heard another shot and when she looked out the door she saw the appellant run by her house with a gun in his right hand. He told her to “be cool.”
During cross-examination, she said the appellant was her cousin and that she liked him.
Essie Mae White, also, heard the argument between the officer and the appellant. She testified that she asked the appellant what was going on and he said: “Willie Petty shot my dog a few years ago and I am going to kill his . ass.” She and the appellant returned to her house and she resumed her telephone conversation she had been engaged in. After she completed her telephone conversation, Jeff Thompson told her to: “Give me your gun because we’re going to kill the m. f.” White told Thompson that she was not going to give him her gun. She recalled that it was about that time that she heard a shot.
At the conclusion of White’s testimony the State completed its case and the defendant made a motion to exclude the State’s evidence on the ground that the State had failed to prove a prima facie case. The motion was overruled. The defendant then requested that the court grant the defendant a directed verdict again, on the grounds that the State had failed to make a prima facie case against the defendant. This request was also denied.
The defense called, as its first witness, Katherine Taylor. Taylor lived in the Westville Courts housing project in Clayton, Alabama, on the date the shooting occurred. She said that Floyd Byrd was in her apartment on the night in question and she went on to say that she did not hear any shooting.
Lillian Fountain was next called and said that she, too, lived in the housing project on the night the shooting occurred. She testified that at the time of the shooting she crawled into her bathroom and got into her bathtub. Subsequently she said that she went outside and talked to some people, among them Martha Ann Eutsey. According to Fountain, Eutsey told her that she was in the house at the time of the shooting.
*118 During cross-examination, Fountain said that she did not know anything about the shooting and did not see it.
Willie Kinsey lived in the same apartment building with Lillian Fountain at the Westville Housing Project. According to Kinsey, immediately after he heard the shot fired, he went outside of his house and saw Martha Ann Eutsey and the appellant standing near a tree.
At the completion of Kinsey’s testimony, the defense rested and, after some rebuttal testimony, the case was submitted to the jury-
I
Appellant contends the trial court erred in taking judicial notice, that if the assaulted police officer was on patrol, he was on official business. Counsel argues that this was an essential fact in issue and was a “gross usurpation of the jury function and irreversibly prejudiced the rights of the appellant.”
The comments by the trial judge were found in the testimony as follows:

“Q All right. And where were you when you said you got this call?
“A I was over on East College Street at B. C. Britt’s Dry Cleaners.
“Q What was your purpose in being there?
“A I was just talking to him.
“Q Huh?
“A I was just talking to him.
“Q On official business?
“A Well, I wouldn’t call it official business. I was on my patrol.
“Q But, you stopped to talk to the fellow at the cleaners there?
“A Right.
“Q And were you on official business when you were talking with the man at the cleaners?
“A Well, there wasn’t no official business but I was on my patrol.
“Q Well, if it wasn’t official business, it wasn’t the town’s business was it?
“A (No audible response.)
“Q You wasn’t on business for the Town of Clayton were you when you stopped to talk to the gentleman at the cleaners were you?
“A (No audible response.)
“MR. REEVES: Your Honor, I think he is badgering the witness. He was on duty, he was in uniform performing whether it was on business or not.
“THE COURT: I think so. He said he was on his patrol.
“MR. GRAVES: I believe he said he wasn’t on official business, your Honor.
“THE COURT: If he is on patrol he is on official business. He said he was on patrol.
“MR. GRAVES: All right, sir. Your Honor takes judicial notice of that?
“THE COURT: I do take judicial notice of that.
“MR. GRAVES: All right, sir.”
The statutory crime form which the defendant is charged is set out in Code of Alabama 1975, § 13-1-42, and reads as follows:
“Whenever any peace officer or other law enforcement officer of this state or any political subdivision of this state shall be engaged in the active discharge of his lawful duty or duties, it shall be unlawful for any person to commit any assault with a deadly instrument upon such officer, and any person guilty of such assault with a deadly instrument shall be guilty of a felony and, upon conviction, shall be imprisoned in the penitentiary for not less than two years nor more than 20 years. (Acts 1967, No. 746, p. 1600, § 3.)”
Under this statute it is a matter of proof for the State to show that the assaulted police officer was on duty. Hopkins v. State, 51 Ala.App. 510, 286 So.2d 920. See Savant v. State, 54 Ala.App. 541, 310 So.2d 260.
In the instant case it is uncontro-verted that at the time Petty was assaulted he was a policeman for the City of Clayton, Alabama, in uniform, and driving a police car in the Westville Courts housing project, *119 in the city of Clayton. The fact that Officer Petty had previously stopped at a cleaners and talked to someone there would in no way alter the fact that, at the time the shooting occurred, he was in a police car, in uniform, “cruising” a street in a housing project in Clayton, Alabama. Without question, the State met this burden of proof and showed that Petty was acting in his official capacity at the time of the assault. See Washington v. State, 57 Ala.App. 465, 329 So.2d 155.
As to the question of whether the trial court was in error in taking judicial notice of this particular fact, we note that the appellant failed to interpose a proper objection. Further, we have examined the record and nowhere does it indicate that an objection was ever made on this point, and there were no requests by appellant for corrective instructions to the jury. Without proper objection interposed, the question is not preserved for review. Moody v. State ex rel. Payne, 295 Ala. 299, 329 So.2d 73; Adams v. State, 291 Ala. 224, 279 So.2d 488; Dendy v. Eagle Motor Lines, 292 Ala. 99, 289 So.2d 603; Rice v. Hill, 278 Ala. 342, 178 So.2d 168; State v. Boyd, 271 Ala. 584, 126 So.2d 225.
II
It is insisted that the trial court was in error when it denied the appellant’s motion to exclude the State’s evidence and when it failed to direct the jury to return a verdict for the defendant on the grounds that the State had failed to prove a prima facie case.
Counsel maintains that the indictment returned against Floyd Byrd charged him with assault upon “William Petty, a peace officer of this state.” He argues that the State proved only that Petty was an employee of the town of Clayton and not a peace officer of the State.
T. 14, § 374(20), Code of Alabama 1940, Recomp.1958,1973 Cum.Supp., now Code of Alabama 1975, § 13-1-42, which was recited above, states in the beginning:
“Whenever any peace officer or other law enforcement officer of this state or any political subdivision of this state . .”
Under this section we hold that Petty was a police officer for the City of Clayton, Alabama, which is a political subdivision of this State. Further, he was a law enforcement officer of a political subdivision, any assault upon him comes within the purview of § 13-1-42, supra. Wallis v. State, 51 Ala.App. 499, 286 So.2d 909; Bowens v. State, 54 Ala.App. 491, 309 So.2d 844; Duke v. State, 56 Ala.App. 163, 320 So.2d 96; Carlile v. State, 57 Ala.App. 398, 328 So.2d 648; City of Birmingham v. Richard, 44 Ala.App. 127, 203 So.2d 692; Alexander v. State ex rel. Carver, 274 Ala. 441, 150 So.2d 204.
Under the facts established by the State, it was sufficiently demonstrated that Officer Petty was an employee of the town of Clayton, engaged in his lawful duty, and the appellant, Byrd, assaulted him with a deadly weapon while Petty was so engaged. The trial court, under these circumstances, was correct in overruling the motion to exclude and refusing a directed verdict for the defendant.
Ill
The appellant next maintains the trial court committed reversible error by sentencing him to five years imprisonment, which he claims: “Is grossly excessive when the judgment of conviction was for a misdemeanor.” Appellant argues that the judgment entry tracks the wording of § 13-1-41, Code of Alabama 1975, which covers a misdemeanor assault only, and reads as follows:
“§ 13-1-41. Assault upon peace officer —Generally. Whenever any peace officer or other law enforcement officer of this state or any political subdivision of this state shall be engaged in the active discharge of his lawful duty or duties, it shall be unlawful for any person to commit any assault or assault and battery upon such officer, and any person guilty of such assault or assault and battery *120 shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not less than $50.00 nor more than $1,000.00, or by imprisonment in the county jail for not less than 30 days nor more than one year, or by both such fine and imprisonment. (Acts 1967, No. 746, p. 1600, § 2.)”
Counsel strongly insists that due to the fact that the judgment entry tracked the above section of the Code, the appellant could only be sentenced under the misdemeanor statute.
The judgment entry shows as follows: “CONSIDERED AND ADJUDGED by the Court that Floyd Byrd, the said defendant, is guilty of Assault of Police Officer in Performance of His Duties, and the defendant, being in open Court, and being asked by the Court if he had anything to say why the sentence of the law should not now be pronounced upon him, says nothing. It is therefore, considered by the Court and it is the judgment and sentence of the Court that the said defendant, Floyd Byrd, be imprisoned in the penitentiary of the State of Alabama for the term of five (5) years.”
From the reading of the judgment entry, we see that there was a deletion of the fact that the assault was committed with a deadly weapon.
It is clear that in the present case, the assault on Officer Petty was, in fact, with a deadly weapon. Officer Petty, during his testimony, stated that he found a bullet lodged in the channel in the top of the window that had been blown out by the blast.
The distinction pointed out in Sharpe v. State, Ala.Cr.App., 340 So.2d 885, is inapplicable here. In Sharpe, the instrumentality was an aluminum chair and that presented the factual issue of whether or not the chair used could be considered a deadly weapon. In the case before us, it cannot be reasonably inferred that the object that struck Officer Petty’s patrol car was not fired from a deadly instrumentality.
Under these circumstances, § 13-1-41, Code of Alabama 1975, had no application. Lowe v. State, 54 Ala.App. 280, 307 So.2d 86. Further, based on this court’s opinion in Lowe, no lesser included offense exists if, in fact, the assault on the police officer was done with a deadly weapon. It is clear from the transcript of evidence that the circuit judge was referring to the felony assault statute. The arrest warrant, the appearance bond, and the indictment were all framed in the language of the felony statute. In fact, the circuit judge read the felony assault statute verbatim to the jury in his oral charge. Further, the jury’s verdict referred to the indictment.
Under the facts proved by the State, the jury in this case could by no stretch of the imagination, reason that the assault was not committed with a deadly weapon. We recognize the judgment entry did not include the words, “with a deadly weapon,” and we believe that this was either an oversight or a clerical error. It is hard to conceive there would be any doubt what crime Floyd Byrd was charged with, tried for, or what crime the jury ultimately convicted him for.
The deletion of the words, “with a deadly weapon,” did in no way deprive this appellant of a fair trial. His rights were fully protected and the verdict rendered by the jury was in accordance with the evidence submitted during the trial. However, in order to assure that the judgment entry conforms to the record as it stands, it is the opinion of this court that the case be remanded for proper sentencing.
IV
Finally, the appellant asserts that, because the judgment of conviction was dated erroneously, the adjudication of guilt was not valid. Appellant points out that he was tried on August 10, 1977, and was sentenced on the same day. That the judgment of conviction states August 9, 1977.
Counsel for the appellant is correct in his assertion that the dates were incorrect. The discrepancy in dates is an obvious clerical error, especially when viewed in the *121 light of the other court records and the notice of appeal signed by appellant’s attorney.
We do not believe that the discrepancy in dates requires a reversal of this case because it in no way prejudiced the rights or deprived the appellant of a fair trial. However, these discrepancies can be corrected by the remand we have mandated in the foregoing paragraph.
After examining the record and transcript of evidence we find that the judgment is due to be affirmed and the cause remanded for proper sentencing.
AFFIRMED: REMANDED FOR PROPER SENTENCING.
All the Judges concur.